**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

CLERK, U.S. DISTRICT COURT
RICHMOND, VA

OCT - 9 2012

| | |
|---|---|
| PHILIP MORRIS USA INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 3:11CV87–HEH |
| | ) |
| THOMAS VILSACK, Secretary of | ) |
| Agriculture, and | ) |
| UNITED STATES DEPARTMENT OF | ) |
| AGRICULTURE, | ) |
| | ) |
| Defendants, | ) |
| | ) |
| CIGAR ASSOCIATION OF AMERICA, INC., | ) |
| | ) |
| Defendant-Intervenor. | ) |

**MEMORANDUM OPINION**
**(Cross Motions for Summary Judgment)**

Distilled to its essence, this lawsuit challenges the methodology used by the

United States Department of Agriculture ("USDA") in determining assessments levied

against the manufacturers and importers of tobacco products under the Fair and Equitable

Tobacco Reform Act of 2004 ("FETRA"), 7 U.S.C. §§ 518–519(a).  More sharply

focused, the controversy centers on whether the USDA should use the current federal

excise tax rates, or the rates that were in effect when FETRA was enacted, to allocate the

share of liability for those assessments among the six classes of tobacco products that are

established by FETRA.  Although the reasoning underlying the algorithm currently

employed by USDA to calculate the assessment is clear, the underlying logic is a little

more murky.

1

Presently before the Court are motions for summary judgment filed by each of the parties, accompanied by detailed memoranda supporting their respective positions. The Court heard oral argument on September 13, 2012 and invited supplemental briefing on the pivotal question in controversy.

I.

Although the administrative record is extensive, it does not appear that any material facts are in dispute. This case appears to turn on whether the USDA properly implemented the underlying legislation. Because the evolution of the algorithm at issue involves a series of congressional enactments, some discussion of the legislative history is instructive.

In order to stabilize the tobacco industry, Congress, in 1938, adopted a system of price-support programs and marketing quotas. When this price stabilization scheme proved to be more costly than expected, it was repealed by Congress. In its place Congress adopted FETRA, which established a transitional compensation program providing annual installment payments over a period of ten years to tobacco growers to help in their adjustment to a free market. This was known as the Tobacco Transition Payment Program. To implement this buyout scheme, responsibility for its administration was delegated to the Commodity Credit Corporation, an agency of the USDA. The Commodity Credit Corporation was charged with the task of collecting assessments from manufacturers and importers of tobacco products and depositing those funds into the Tobacco Trust Fund. Transitional payments to tobacco growers are made from this fund.

2

Under FETRA, Congress established a two-step process for the USDA to determine the assessments owed by each tobacco product manufacturer or importer. These are commonly referred to as Step A and Step B. 7 U.S.C. § 518d(c)(1) and (e). Only elements of Step A are at issue in this case. Step A of the assessment equation adopted by the USDA allocates the assessments among six product classes. These classes include cigarettes, cigars, chewing tobacco, pipe tobacco, snuff, and roll-your-own tobacco. *See* 7 U.S.C. § 518(c)(1). This process is intended to divide the assessment among these classes based on each class's current share of the overall market for tobacco products. Because different metrics[1] are used to measure the volume of the various tobacco products, the USDA decided to use the maximum federal excise tax ("FET") rate in place when FETRA was enacted as the common unit of measure for each product class. This methodology appears to be modeled after the example provided by Congress in the text of FETRA. Congress specifically delegated the authority to "promulgate such regulations as are necessary to implement [FETRA]" to the Secretary of Agriculture. 7 U.S.C. § 519a(a).

In making the first year calculations, Congress determined the assessments by multiplying the volume of taxable units of product removed into domestic commerce by manufacturers and importers in each class by the 2005 maximum FET rate for that class.[2] FETRA authorized the Secretary of Agriculture to adjust the percentages assessed against

---

[1] Sales volume for cigarettes and cigars is measured by the number of individual items or "sticks" produced, while sales volume for the other classes is calculated in terms of poundage. 7 U.S.C. § 518d(g)(3).

[2] Although Congress provided no explicit explanation for the methodology used in making Step A calculations, the USDA was apparently able to determine the appropriate formula by extrapolation.

3

the six classes of tobacco manufacturers in subsequent years. Specifically, Congress directed the Secretary for the years 2006–2014 to "periodically adjust the percentage of the total amount required . . . to be assessed against, and paid by, . . . each class of tobacco product . . . to reflect changes in the share of gross domestic volume held by that class of tobacco product." 7 U.S.C. § 518d(c)(2).

In order to achieve what it views to be consistency, the USDA continued to utilize the 2005 maximum FET rate rather than the current maximum FET rate to adjust the Step A assessments each quarter. According to the USDA, this enables the agency "to adjust assessments based solely upon any increases or decreases in the volume of each of the six types of tobacco products, as required by FETRA." (Defs.' Mem. of P. & A. in Support of Defs.' Cross Mot. Summ. J. and Opp'n to Pl.'s Mot. Summ. J. 2; ECF No. 53 (hereinafter "USDA Memo").)[3]

In its attempt to fashion a computational methodology that reflects the intent of Congress, the USDA adopted a formula in which the 2005 federal excise tax is the constant, and gross domestic volume the variable. The USDA maintains that this method insures that share of gross domestic volume is the controlling factor in periodically reassessing class allocation. (USDA Memo 15.) Plaintiff disagrees contending that "it is a dual variable equation because the share is something that has to be determined by

---

[3] Although Step B of the process is not at issue in the immediate litigation, it entails the allocation of each tobacco product class's assessment on a pro rata basis among particular manufacturers and importers within each product class. 7 U.S.C. § 518d(e)(1). This computation requires the USDA to divide class shares "on a pro rata basis among manufacturers and importers based on each manufacturer's or importer's share of gross domestic volume." 7 U.S.C. § 518d(e)(1). *See also* 7 C.F.R. § 1463.5(a).

converting to a common method." (Sept. 13, 2012 Hrg. Tr. at 50:20-23.) The necessity for conversion to a common industry-wide method does not appear to be in dispute. The debate turns on which method of conversion most accurately captures the share of gross domestic volume.

The principal focus of Plaintiff's challenge in this case is the USDA's practice through implementing regulation of using the 2005 maximum FET rate rather than the current FET rate as the conversion factor in Step A. Plaintiff urges this Court to direct the USDA to promulgate a rule requiring the use of current FET rates in past, present, and future Step A calculations and refund amounts erroneously assessed. Although courts "ordinarily wade into a statute's legislative history only after deeming the statute ambiguous," a review of subsequent congressional action provides useful context. *Nat'l Elec. Mfrs. Ass'n v. U.S. Dep't of Energy*, 654 F.3d 496, 504 (4th Cir. 2011).

The Children's Health Insurance Program Reauthorization Act ("CHIPRA"), enacted by Congress in 2009, brought significant increases in the maximum excise tax rates on all classes of tobacco. 26 U.S.C. § 5701. The legislation, however, had a disproportionate impact on those classes. The maximum FET rate on cigars increased considerably. As Defendant-Intervenor Cigar Association of America, Inc. points out in its Memorandum in Support of Cross Motions for Summary Judgment and Opposition to Plaintiff's Motion for Summary Judgment, if current FET rates were used as the conversion factor, as urged by Plaintiff, the Step A class allocation for cigars would increase significantly and that for cigarettes dramatically decrease, without any consideration of changes in volume. CHIPRA, however, makes no express adjustment to

either the formula for the Step A allocations under FETRA or the excise tax rate to be used in those calculations.

Congress also enacted the Family Smoking Prevention and Tobacco Control Act ("FSPTCA") in 2009. This enactment shifted some regulatory authority over tobacco products to the Food and Drug Administration ("FDA"). To underwrite the costs of this regulatory program, Congress authorized the FDA to impose an additional assessment on a number of classes of tobacco products as a user fee. 21 U.S.C. § 387s. Plaintiff is correct that Congress refers to the FETRA methodology and accompanying regulations in prescribing how the FSPTCA user fees will be allocated among the various classes of tobacco products described in 21 U.S.C. § 387s(b)(2)(B)(i). The first reference is found in 21 U.S.C. § 387s(b)(2)(B)(ii), "[A]LLOCATIONS.—The applicable percentage of each class of tobacco product described in clause (i) [setting forth the various classes of tobacco products] for a fiscal year shall be the percentage determined under section 625(c) of Public Law 108–357 [7 U.S.C. § 518d(c)] for each such class of product for such fiscal year." This provision appears to direct the FDA to use the class percentages calculated under FETRA to determine the allocation of user fees for each fiscal year. A plain reading of the statute does not suggest any intention on the part of Congress to modify the Step A calculation scheme used by the USDA under FETRA. The FETRA methodology is also mentioned in 21 U.S.C. § 387s(b)(4). But again, there is no

indication within the text that 2008 FET rates adopted in CHIPRA should be used with the referenced Step A FETRA calculations.[4]

Despite urging by several segments of the tobacco industry and a number of members of Congress, the USDA declined to alter its Step A assessment methodology to reflect the actual revised federal excise tax rates.  To formalize its policy decision, the USDA published a "technical amendment" to its 2005 regulations which articulated the justification for its adopted method of performing the Step A regulations.  The regulatory amendment restates its policy of allocating class shares based on the agency's "determination of each class's share of the excise taxes paid using for all years the tax rates that applied in fiscal year 2005."  7 C.F.R. § 1463.5(a) (2011).  In further explaining its regulatory amendment, the USDA stated that in order to ensure that the Step A adjustments were driven by changes in volume, as directed by Congress, as opposed to changes in tax rates, a constant tax rate is critical to the calculation.  *See* 75 Fed. Reg. at 76,921–22.  The USDA continues to use the methodology reflected in the 2010 regulatory amendment to calculate the Step A class shares.

## II.

Following promulgation of the 2010 regulatory amendment, the Plaintiff appealed the USDA's FETRA assessments for the first, second, and third quarters of fiscal year 2011.  Plaintiff urged the USDA to recalculate the assessments to reflect the excise taxes

---

[4] The Family Smoking Prevention and Tobacco Control Act of 1969 is a lengthy document which has been thoroughly reviewed by the Court.  If there are other references to FETRA within the Act that have not been discussed above, it is because they have not been pointed out by counsel.

paid by the cigarette class under the revised FET rates that Congress imposed in 2009

under CHIPRA. In its Memorandum in Support of its Motion for Summary Judgment,

Plaintiff maintains that

> USDA denied each of [Philip Morris'] appeals without considering the
> legal or factual bases for them, stating that [Philip Morris] "may appeal the
> existence and the amount of the bill or any part of the assessment," but that
> it may not "use the appeal process to challenge statutory or regulatory
> provisions or any mathematical formula or other procedure [or] policy that
> is generally applicable to all similarly situated participants."

(Pl.'s Mem. Support of Mot. Summ. J. 12.)

Plaintiff subsequently petitioned the USDA for clarification, maintaining that

current FET rates must be used to calculate tobacco product class shares under FETRA.

Plaintiff's petition for rule-making clarification was rejected by the USDA. In justifying

its rejection of the petition, the agency remained steadfast in its position that Congress

did not intend the USDA to use current FET rates in calculating class share assessments

under FETRA. This lawsuit followed.

> Plaintiff's Amended Complaint
>
> seeks an order declaring that USDA acted unlawfully both by issuing the
> Regulatory Amendment and by denying the appeals and petition.
> [Plaintiff] also seeks an order directing the agency to apply current FET
> rates when performing Step A calculations for all future assessment periods
> and to promulgate a rule requiring the continued use of those rates. Finally,
> in accordance with FETRA, [Plaintiff] asks the Court to order "a refund of
> the excess assessments already paid."

(Pl.'s Mem. Support Mot. Summ. J. 13.)

### III.

The core issue before the Court—and the linchpin of other allied claims—is the legal soundness of the USDA's 2010 regulatory amendment formally adopting the USDA's practice of employing 2005 FET rates when performing Step A calculations. Consequently, the scope of judicial review is governed by the Administrative Procedures Act ("APA"), 5 U.S.C. § 551 *et seq*. As the United States Court of Appeals for the Fourth Circuit acknowledged in *Ohio Valley Envtl. Coalition v. Aracoma Coal Co.*, 556 F.3d 177, 172 (4th Cir. 2009), the scope of review under the APA is narrow, however, "the court must nonetheless engage in a 'searching and careful' inquiry of the record." *Id.* at 192 (citations omitted). Judicial review of agency actions is highly deferential and begins with a presumption of validity. *See Natural Res. Def. Council v. EPA*, 16 F.3d 1395, 1400 (4th Cir. 1993) (citation omitted). To overturn an administrative act, a court must find the action to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). In other words, the court must find that the agency committed a clear error of judgment. *Wilson v. Office of Civilian Health & Med. Programs of the Uniformed Servs.*, 65 F.3d 361, 364 (4th Cir. 1995) (citations omitted).[5] A statutory grant of discretion is "not a roving license to ignore the statutory text" but instead "a direction to exercise discretion within defined statutory limits." *Mass. v. EPA*, 549 U.S. 497, 533 (2007).

---

[5] Procedurally, this case is before the Court on cross motions for summary judgment. To resolve the underlying claim, this Court must find that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). Since the immediate task at hand involves a review of the administrative record and the soundness of the agency's resulting administrative action, there appear to be no material facts in dispute barring final resolution. *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 743–44 (1985).

The time-honored standard for judicial review of administrative agency actions was articulated by the United States Supreme Court in *Chevron, U.S.A., Inc. v. Natural Res. Def. Council*, 467 U.S. 837 (1984). All parties agree that the Court's analysis is governed by the two-step process in *Chevron*. "First, always, is the question whether Congress has directly spoken to the *precise question* at issue. If the intent of Congress is clear, that is the end of the matter." *Id.* at 842 (emphasis added). To undertake this process, the Court "employe[s] traditional tools and statutory construction." *Id.* at 843 n.9.

However, if "the statute is silent or ambiguous with respect to the specific issue, the question . . . is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843. In applying the second step of the *Chevron* analysis, the "court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the [] agency." *Id.* at 844; *see also Maryland Dep't of Human Res. v. U.S. Dep't of Agric.*, 976 F.2d 1462, 1475 (4th Cir. 1992). As the Fourth Circuit noted in *National Elec. Mfrs. Ass'n*, "[i]f we determine that 'the statute is ambiguous on the' precise question at issue, 'we defer at [*Chevron's*] step two to the agency's interpretation so long as the construction is a reasonable policy choice for the agency to make.'" 654 F.3d at 505 (citations omitted).

While an agency's interpretation of its own rules and regulation is entitled to heightened deference, to survive legal challenge it must be "rational and consistent with the statute" it interprets. *NLRB v. United Food & Commercial Workers Union, Local 23*, 484 U.S. 112, 123 (1987); *see also Christopher v. SmithKline Beecham Corp.*, 132 S. Ct.

2156, 2165 (2012).  This same standard of review applies to an agency's refusal to promulgate a rule or regulation.  *Am. Horse Prot. Ass'n v. Lyng*, 812 F.2d 1 (D.C. Cir. 1987).

Disagreement between the parties in this case begins at the very inception of the *Chevron* analysis.  Plaintiff, Philip Morris USA, contends that the intent of Congress is clear—FETRA requires the USDA to use current FET rates to calculate class assessments under Step A.  Plaintiff maintains that the plain language and structure of FETRA compel this conclusion.  It points to language in the preamble of the regulation suggesting that the model methodology should be used in future years.  Plaintiff adds, however, that Congress never explicitly directed the USDA to use "outdated tax rates." (Pl.'s Mem. Support of Mot. Summ. J. 15.)

To further support this contention, Plaintiff stresses that Congress directed the USDA to adjust the Step A calculations periodically to reflect changes in the share of domestic volume held by each class of tobacco product.  *See* 7 U.S.C. § 518d(c)(2). Furthermore, Plaintiff draws the Court's attention to the reporting requirements imposed by Congress on manufacturers and importers of tobacco products.  Section 518d(g)(1)-(2) requires manufacturers and importers to disclose the quantity of tobacco products placed into the stream of commerce during the period in question and the amount of current federal excise taxes paid on that product.  Plaintiff concludes that "this statutory structure makes clear that Congress intended current tax rates to be used in calculating the Step A allocations." (Pl.'s Reply Mem. 6.)

11

The Defendants, USDA and the Cigar Association of America, on the other hand, point out that FETRA requires the USDA to adjust assessments periodically based on changes in gross domestic volume, not fluctuations in federal excise tax. They correctly note that the Step A methodology or mechanics of calculation were developed by USDA based on clearly discernible guidance from the statute. *See* 70 Fed. Reg. 7007 (2005). Defendants further stress that the periodic adjustment requirement was clearly intended to reflect changes in domestic volume. As to the use of the 2005 FET as a constant in the Step A FETRA equation, and gross domestic volume as the variable factor, the extent of congressional direction becomes a bit less clear. The Defendants observe that FETRA contains no clear congressional directive prohibiting the Secretary of Agriculture from using 2005 FET as a constant conversion factor in the algorithm. Furthermore, the Defendants hasten to add that despite Plaintiff's contentions, no subsequent congressional enactments, or failure to act, provides direction to the contrary. At core, it is Defendants' position that while FETRA provides specific guidance as to the computational framework for assessments, the mechanics of calculation reside within the purview of the Secretary of Agriculture under § 519a(a).

With respect to this facet of the *Chevron* analysis, the Defendants seem to hold the stronger hand. As the Court noted in *United States v. Native Wholesale Supply Co.,* "[o]bviously, this [Fair and Equitable Tobacco Reform Act of 2007] is not a model of clarity." 822 F. Supp. 2d 326, 332 (W.D.N.Y. 2011). In explaining the rationale for proceeding to the second step of *Chevron*, in *National Elec. Mfrs. Ass'n*, the Fourth Circuit commented that it was appropriate "where the statutory language 'neither plainly

12

compelled nor clearly preclude[d] [an] interpretation.'" 654 F.3d at 505 (citation omitted).

Finding an absence of clear congressional intent, the Court will turn to the second tier of *Chevron* to evaluate this element of Step A. This requires the Court to determine "whether the agency's interpretation of the statute in question, as embodied in its regulation, is reasonable and therefore entitled to deference." *William v. Gonzales*, 499 F.3d 329, 332 (4th Cir. 2007) (citations omitted).

As the court emphasized in *Chevron*, "'the power of an administrative agency to administer a congressionally created . . . program necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress.'" 467 U.S. at 843 (quoting *Morton v. Ruiz*, 415 U.S. 199, 231 (1974)).[6] Furthermore, the Supreme Court in *Chevron* counseled trial courts against substituting its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency. "We have long recognized that considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer." *Chevron*, 467 U.S. at 844. The central task for this Court is to determine whether use of the maximum 2005 FET in Step A of the FETRA assessment was a rational and consistent construction of the congressional intent underlying FETRA.

---

[6] Plaintiff urges the Court to afford the Secretary's construction of the FETRA assessment methodology minimal deference. In Plaintiff's view, the agency's administration of the transitional compensation program created by FETRA requires no specialized skills or expertise by the USDA. The agency is merely "being a bank." (Sept. 13, 2012 Hrg. Tr. at 56:12.) In the immediate case, however, Congress specifically empowered the Secretary to promulgate all necessary regulations to implement the statute. *See* 7 U.S.C. § 519a(a).

13

A second tier analysis under *Chevron* begins with a close examination of the statutes at issue. Plaintiff's challenge is premised in significant part on its belief that the Secretary has misinterpreted the intent of Congress expressed in 7 U.S.C. § 518d(c)(2). This section requires the Secretary to periodically recalibrate the FETRA assessment allocation for classes of tobacco products. Section 518d(c)(2) reads:

> [f]or subsequent [] years [after 2005] the Secretary shall periodically adjust the percentage of the total amount required under subsection (b) to be assessed against, and paid by, the manufacturers and importers of each class of tobacco product specified in paragraph (1) to reflect changes in the share of gross domestic volume held by that class of tobacco product.

Title 7 U.S.C. § 518d(a)(2) defines gross domestic volume as "the volume of tobacco products (A) removed [from the factory, internal revenue bond or customs custody] and (B) not exempt from tax."[7]

Clearly, under the statute, the mission assigned to the Secretary is the periodic adjustment of the assessment "to reflect changes in the share of gross domestic volume held by that class of tobacco product." 7 U.S.C. § 518d(c)(2). Conspicuously absent from § 518d(c)(2) is any reference to fluctuation in federal excise tax as a governing factor.

To further bolster its contention that Congress intended for the Secretary to use current FET rates in computing the FETRA assessments, Plaintiff adverts the Court's

---

[7] The term "removed" as defined by 26 U.S.C. § 5702(j) is interpreted to mean the placement of product into the stream of commerce. The precise text of 7 U.S.C. § 518d(a)(2)(B) reads in part, "not exempt from tax under chapter 52 . . . at the time of their removal." Plaintiff contends that this reference to being currently subject to taxation adds torque to their argument that Step A FETRA assessments should be based on present FET numbers. The Court, however, interprets this language as words of limitation. The products comprising gross domestic volume only includes items placed into the stream of taxable commerce.

attention to § 518d(g) and (h). These sections are entitled "Determination of volume of domestic sales" and "Measurement of volume of domestic sales," respectively. Subsection (g) provides in pertinent part, "[t]he calculation of the volume of domestic sales of a class of tobacco product by a manufacturer or importer . . . shall be made by the Secretary based on information provided by the manufacturers and importers pursuant to subsection (h)." That section requires each manufacturer and importer of tobacco products to periodically file with the Secretary a certified form disclosing the volume of its tobacco products removed into domestic commerce and the excise taxes paid. Plaintiff maintains that the only logical rationale for collecting such information is to enable the Secretary to accurately conduct the Step A assessment process—using current data.

The Defendants counter that while current FET rates have no active function in the Step A calculations, they are critical in the allocation of assessment within each class of tobacco product in Step B. *See Native Wholesale Supply*, 822 F. Supp. 2d at 331. As delineated in § 518d(f)

> The amount of the assessment for each class of tobacco product specified in subsection (c)(1) [of §518d] . . . shall be determined for each quarterly payment period by multiplying—
> (1) the market share of the manufacturer or importer, as calculated with respect to **that payment period**, of the class of tobacco product; by
> (2) the total amount of the assessment for **that quarterly payment period** under subsection (c), for the class of tobacco product.

*Id.* (emphasis added).

Given the specific language of the statute, it appears that the Defendants' explanation for the Secretary's use of the information supplied under § 518d(h) is more

15

plausible. This conclusion is driven by logic as well as statutory construction. If the Court were to adopt Plaintiff's theory, the periodic adjustment mandated under § 518d(c)(2) would not turn on changes in the share of gross domestic volume, as directed by Congress, but would be a function of a combination of gross domestic volume and fluctuation in FET rates. Nothing in FETRA or the interpretative regulations appear to suggest this construction.[8]

During oral argument, Plaintiff highlighted language in *Swisher Int'l v. Schafer*, 550 F.3d 1046 (11th Cir. 2008) as squarely supportive of its position. The court in *Swisher* noted that "[t]he market share for each class is determined by multiplying each class's tobacco volume by the excise taxes paid by that class in the prior year." *Id.* at 1050 (citing 7 C.F.R. §§ 1463.3, 1463.4). "Determination of the market share of each tobacco class is referred to as 'Step A.'" 550 F.3d at 1049. Plaintiff's citation is accurate, but its import is questionable. First, the Step A methodology was not at issue in *Swisher*, which dealt solely with a Fifth Amendment challenge to FETRA. And second, the language "excise taxes paid by that class **in the prior year**" appears nowhere in the FETRA statute or interpretative regulations in connection with Step A. Plaintiff, however, urges the Court to delve deeper into the legislative history.

---

[8] Plaintiff also maintains that the theory of construction urged by the Defendants assumes "different and contradictory meanings to the statutory phrase 'share of gross domestic volume.'" (Pl.'s Mem. Support of Mot. Summ. J. 15.) According to Plaintiff under Defendants' approach, the share of gross domestic volume is calculated in Step A by multiplying current volume by 2005 outdated tax rates, while Step B, in contrast, calculates each manufacturer's share of gross domestic volume from most classes on the basis of current taxes paid. *Id.* at 15–16. The distinction here is subtle but significant. The difference is one of application rather than meaning.

The final facet of Plaintiff's argument is premised on a rarely invoked and seldom applied theory of ratification by congressional inaction. *See Bob Jones Univ. v. United States*, 461 U.S. 574, 600–01 (1983). The theoretical foundation for Plaintiff's position is built on the assumption that Congress, in enacting FETRA, spoke directly to the excise tax rates that must be used when performing the Step A calculations. The apparent genesis of this foundational construct is that FETRA was enacted in 2005 and Congress, in exemplifying the prescribed calculation methodology, used then current 2005 FET rates. *See* § 518d(c)(1). In advancing its theory of congressional ratification, Plaintiff posits that the use of 2005 FET rates in the 2005 legislation demonstrates an intent on the part of Congress that future Step A calculations use current FET rates. Assuming this construction of §518d(c)(1) is correct, Plaintiff seeks to persuade the Court that no congressional action has modified this methodology since its inception. Therefore, Plaintiff argues that the Court can at least infer that Congress has acquiesced in this interpretation.

Courts, however, have historically been reluctant to rely on congressional inaction as a source of enlightenment. *See Brecht v. Abrahamson*, 507 U.S. 619, 632 (1993). In fact, courts have been reluctant to even draw inferences from Congress' failure to act. *Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293, 306 (1988).

In its Memorandum in Support of its Motion for Summary Judgment, Plaintiff notes that

> In 2005, 2007, and 2009, the cigar industry reminded Congress about USDA's Step A methodology and lobbied for statutory amendments that would have overridden USDA's interpretation and reduced or eliminated

the impact of the changes in FET rates on future cigar class shares.
Congress declined to adopt any of the cigar industry's proposals.

(Pl.'s Mem. Support of Mot. Summ. J. 25.)  Plaintiff then maintains that it is well

established that "congressional failure to advise or repeal [an] agency's interpretation of a

statute may provide 'persuasive evidence that the interpretation is the one intended by

Congress.'" *NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 275 (1974); *Eltra Corp. v.*

*Ringer*, 579 F.2d 294, 298 (4th Cir. 1978).  While the principle cited by Plaintiff is

correct in the abstract, it has no application to the immediate case.

In each of the cases relied upon by Plaintiff to support its argument, Congress—or

a committee thereof—actually had the pertinent statute under review.  The rejection of an

amendment, or reenactment of the operative provision in subsequent legislation, is

probative evidence of congressional acquiescence.  *See United States v. Riverside*

*Bayview Homes, Inc.*, 474 U.S. 121, 137 (1985).

Here, Plaintiff's assertion of congressional ratification is based solely on

ineffectual lobbying coupled perhaps with constituent correspondence.  There is no

indication in the record that any member of Congress initiated any formal action—or

inaction—in response.  A thorough scan of the legal landscape has revealed no reported

decision by any federal circuit court of appeals embracing the application of legislative

ratification based solely on communications to several individual members of Congress.

For example, in *FDA v. Brown & Williamson Tobacco Corp.*, cited by Plaintiff in support

of its legislative acquiescence theory, Congress had considered fifteen different bills

addressing FDA jurisdiction over tobacco products. 529 U.S. 120, 155–56 (2000); *Brown & Williamson Tobacco Corp. v. FDA*, 153 F.3d 155, 170–71 (4th Cir. 1998).

Even if this Court assumes that Plaintiff's foundational premise is correct, that Congress intended for current FET rates to be used in the Step A calculations, its ratification and acquiescence argument is unpersuasive and lacking in authoritative underpinnings. If Congress in fact had concerns that the USDA was misconstruing its clearly expressed direction, it had ample opportunity for legislative correction.

IV.

In the final analysis, this Court is not persuaded that the Secretary of Agriculture has acted arbitrarily or unreasonably in calculating the FETRA assessments challenged by the Plaintiff. Undoubtedly, alternative methods of computation could be conceived, and perhaps convincingly defended, but that is not the task at hand. As the Supreme Court emphasized in *Chevron*, a court "need not conclude that the agency construction was the only one it permissibly could have adopted to uphold the construction, or even the reading the court would have reached if the question initially had arisen in a judicial proceeding." *Chevron*, 467 U.S. at 843 n.11. The methodology employed by the Secretary appears to faithfully adjust the percentage of the total amount required to be assessed against each class of tobacco product "to reflect changes in the share of gross domestic volume," as directed by 7 U.S.C. § 518d(c)(2).

The Court therefore finds that the class assessment scheme promulgated by the USDA in the 2010 regulatory amendment at issue reasonably reflects the congressional intent underlying FETRA. Accordingly, Plaintiff's Motion for Summary Judgment and

19

request for refund of assessments will be denied.  The Defendant's Motion for Summary

Judgment will be granted and this case will be dismissed.

An appropriate Order will accompany this Memorandum Opinion.


/s/
Henry E. Hudson
United States District Judge

Date: Oct 9 2012
Richmond, VA